IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CISCO SYSTEMS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. ________________ |
| | ) | |
| SPHERIX INCORPORATED, | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| Defendant. | ) | |
| | ) | |

**CISCO SYSTEMS, INC.'S COMPLAINT**

Plaintiff Cisco Systems, Inc. ("Cisco"), for its Complaint against Spherix Incorporated ("Spherix"), hereby alleges, on knowledge as to its own actions and on information and belief as to all other matters, as follows:

**INTRODUCTION**

1. Spherix Incorporated is a non-practicing entity seeking royalties from Cisco (and others) for alleged patent infringement by unlawful means. Spherix is breaching its obligation to license alleged standard-essential patents ("SEPs") on fair, reasonable, and non-discriminatory ("FRAND") terms. This action seeks to rectify those unlawful acts.

**THE PARTIES**

2. Cisco is incorporated under the laws of California, with its principal place of business at 170 West Tasman Drive, San Jose, California 95134.

3. On information and belief, Spherix is incorporated under the laws of Delaware, with its principal place of business at 6430 Rockledge Drive, Suite 503, Bethesda, Maryland 20817.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337, 1338(a), 2201, 2202, the Declaratory Judgment Act, and under the patent laws of the United States, 35 U.S.C. § 1 et seq.

5. This Court has supplemental jurisdiction over Cisco's state-law claims under 28 U.S.C. § 1367.

6. Spherix is subject to the personal jurisdiction of this Court by virtue of its sufficient minimum contacts with this forum at least as a result of its organization under the laws of Delaware.

7. Venue is proper in this district because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.

## BACKGROUND

### A. Spherix

8. Spherix was once, but is no longer, a developer of therapeutic products for the treatment of diabetes. *See, e.g.*, Spherix Form 10-Q (filed August 8, 2011); Form 10-K (filed March 28, 2014). That business proved unsuccessful, and Spherix transformed itself to focus on the acquisition and licensing of patents allegedly covering networking products. *Id.*

9. Spherix also created a wholly owned subsidiary — NNPT, LLC ("NNPT") — which, like Spherix, does not manufacture or sell any products, but rather is a patent holding company created to acquire, assert, and license patents.

10. Spherix and Cisco have been engaged in a pattern of litigation. Spherix has asserted nineteen patents in litigation against Cisco thus far, in two cases. First, Spherix and NNPT asserted eleven patents — RE40467 ("the '467 Patent"), 6,697,325 ("the '325 Patent"), 6,578,086 ("the '086 Patent"), 6,222,848 ("the '848 Patent"), 6,130,877 ("the '877 Patent"),

5,970,125 (“the ’125 Patent”), 6,807,174 (“the ’174 Patent”), 7,397,763 (“the ’763 Patent”), 7,664,123 (“the ’123 Patent”), 7,385,998 (“the ’998 Patent”), and 8,607,323 (“the ’323 Patent”) — against Cisco networking products in the District of Delaware (C.A. No. 14-393) (“the Delaware Litigation”). The Delaware Litigation also involves nine additional patents — 5,959,990 (“the ’990 Patent”), RE40999 (“the ’999 Patent”), 6,111,876 (“the ’876 Patent”), RE44775 (“the ’775 Patent), RE45065 (“the ’065 Patent”), RE45081 (“the ’081 Patent”), RE45095 (“the ’095 Patent”), RE45121 (“the ’121 Patent”), and RE45521 (“the ’521 Patent”) (collectively, the “Frantz” Patents) — that are the subject of declaratory judgment claims by Cisco based on Spherix’s pre-suit assertions that those patents are SEPs and cover Cisco’s VLAN technologies. *See* Ex. 1 ¶¶ 29, 30, 34, 35. Eight of the Frantz patents in the Delaware Litigation — the ’990, ’876, ’999, ’775, ’065, ’081, ’095, and ’121 Patents — are also pending in an action brought by Spherix against Cisco’s VLAN technologies in the Eastern District of Virginia (Case No. 1:15-cv-00576) (“the Virginia Litigation”). All of the patents in the Delaware and Virginia Litigations are directed at networking technology.

11. The ’990 and ’999 Patents were additionally the subject of counterclaims by Cisco against Spherix in the District of Delaware (C.A. No. 13-2020). This case is now closed.

12. Cisco has filed petitions with the Patent Trial and Appeal Board for *Inter Partes* Review against the ’323 and ’763 Patents in case numbers IPR2015-01001 and IPR2015-00999, respectively.

13. Spherix initiated suit against Verizon — a customer of Cisco — in the Eastern District of Virginia (Case No. 1:14-cv-721) alleging infringement of four networking technology patents. In that case, Spherix subpoenaed Cisco as a third party multiple times, for both

documents and deposition testimony, and the parties repeatedly disputed the proper scope of discovery.

14. The ’990, ’876, ’999, ’775, ’065, ’081, ’095, ’121, and ’521 Patents all allegedly relate to standard-essential VLAN technology.

15. On June 30, 2015, Spherix was issued U.S. Patent RE45598 (“the ’598 Patent”) (attached hereto as Ex. 2[1]), which issued from U.S. Patent Application Serial No. 13/728,698. The ’598 Patent is titled “VLAN Frame Format” and is Spherix’s tenth alleged standard-essential patent relating to VLAN technology. *See* Ex. 3.

16. The ’598 Patent is part of the same family as the other Frantz patents. The ’598 Patent is a division of the ’775 Patent, which is a division of the ’999 Patent, which is a reissue of the ’876 Patent, which is a continuation-in-part of the ’990 Patent. Additionally, the ’598 Patent is in the same family of networking technology patents as the ’065, ’081, ’095, ’121, and ’521 Patents. Seven of the patents have reissued from the ’876 Patent (the ’999, ’775, ’065, ’081, ’095, ’521, and ’121 Patents). The ’876 patent, in turn, is a continuation-in-part of the ’990 patent. All patents share the same two inventors (Paul James Frantz and Geoffrey O. Thompson), have nearly identical specifications, are directed at the same technology, and have claims directed at substantially similar subject matter.

17. Spherix has asserted that all of the Frantz patents, including the ’598 patent, are SEPs, and cover Cisco’s VLAN technologies. Additionally, despite having obligations to license the ’598 patent on FRAND terms as alleged below, Spherix has refused to meet its FRAND obligations with respect to Cisco for that patent or any of the other Frantz patents.

---

[1] The printed version of the ’598 Patent was not yet available as of the filing of this complaint. Exhibit 2 contains the Notice of Allowability, the allowed claims, and the Issue Notification identifying the patent number and issue date.

**B. Spherix's Patents Originated From Nortel**

18. The patents held and asserted by Spherix were originally owned by Nortel Networks Corporation and its subsidiaries (collectively, "Nortel").

19. Nortel was a supplier of communications products and services. During its time as a product company, Nortel held a portfolio of thousands of patents and patent applications.

20. Nortel participated in various standards development activities and gave binding FRAND commitments for numerous patents it owned. These FRAND commitments arose because of specific activities and voluntary obligations that Nortel undertook at various SSOs, including the IEEE.

**C. Nortel Files For Bankruptcy And Sells Its Patents**

21. In 2009, Nortel filed for bankruptcy and began the process of winding down its operations, liquidating its assets, and selling its patent portfolio.

22. After multiple rounds of bidding, Rockstar Bidco, LP purchased Nortel's patents, and then transferred them to Rockstar Consortium US LP and/or Rockstar Consortium LLC ("Rockstar").

23. When Rockstar acquired these patents from the Nortel bankruptcy estate, Rockstar assumed the FRAND obligations that Nortel previously had made.

**D. Spherix Acquired Patents From Rockstar**

24. Spherix entered into a written agreement with Rockstar for the purchase of seven patents on July 10, 2013, and entered into a second such agreement for an additional 101 patents on December 31, 2013. *See* Ex. 4, Spherix Form 8-K/A, filed November 19, 2013, Exhibit 10.1; Ex. 5, Confidential Patent Purchase Agreement Dated December 31, 2013 Between Spherix, Inc. and Rockstar Consortium US LP. These agreements provided for Rockstar to receive a share of future revenue generated by Spherix. *See* Ex. 4 at 4, § 2.5; Ex. 5 at 4, § 2.5. They also made

clear Spherix's mandate to aggressively monetize the patents it acquired. *See, e.g.*, Ex. 4 at 6, § 6.2 (requiring Spherix to retain outside litigation counsel to initiate a patent enforcement litigation within ninety days of the closing date); Ex. 5 at 7, § 6.3 (requiring Spherix to use best efforts to "maximize the value of the Patents, as soon as possible as of the Effective Date"). Collectively, the 108 patents transferred to Spherix comprised less than 3% of the patents in the original Rockstar Portfolio. Spherix's payment obligations under these agreements effectively set high minimum prices at which Spherix must license its patents, if Spherix is to garner profit for itself.

**E. Spherix Has Violated Binding FRAND Obligations**

25. Many of the patents acquired by Spherix (and later NNPT) are subject to FRAND obligations as a result of Nortel's binding commitments with SSOs. Spherix and NNPT have violated those FRAND obligations by refusing to offer FRAND licenses or enter into good faith negotiations.

**i. Standard Setting Organizations And FRAND Obligations**

26. In general, a technical standard is a set of specifications or requirements that provides for interoperability among products manufactured by different entities. Once a standard is established, competing manufacturers can manufacture and sell products that are compliant with the standard, thus ensuring consumers that different products manufactured by different entities will nonetheless be capable of interoperating with one another.

27. The IEEE is a professional association and leading developer of technical standards. IEEE members include engineers, scientists, and allied professionals whose technical interests relate to electrical and computer sciences, engineering and related disciplines. Members may participate in the IEEE standards-setting process in working groups and/or subgroups called task groups.

28. "Industry standards are widely acknowledged to be one of the engines driving the modern economy." *See* Ex. 6, U.S. Dep't of Justice and U.S. Fed'l Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007) at 33. Standards have significant pro-competitive benefits because they, among other things, ensure interoperability of components and drive innovation.

29. An individual standard often incorporates thousands of technologies. For example, the IEEE 802.1Q standard — which is a standard for MAC bridges and virtual bridged local area networks — was developed over the course of many years. Its technical specification is 1,456 pages long with forty-three distinct sections comprising myriad technical features. Because standards contain numerous technologies, there are often hundreds (or even thousands) of patents that may be necessary in order to make a product that complies with the standard.

30. With the benefits of standards come the possibility of abuse as well, and in particular, the problems of "patent hold up" and "royalty stacking" are persistent and well-known. When a technology is incorporated into a standard, the technology is typically chosen from among different options. Once incorporated and widely adopted, that technology must be used, a circumstance often described as "lock-in," because it is by definition necessary to comply with the standard. Some holders of SEPs improperly try to exploit that lock-in by seeking royalties far above the intrinsic value of the patented technology, and thus holding up the licensees. Royalty stacking, in turn, can arise when a standard implicates numerous patents, as is often the case, for standards can incorporate hundreds, even thousands of patents. If the patents involved in a standard are not properly accounted for, the royalties for those patents will "stack" on top of each other and may become excessive in the aggregate.

31. To address concerns of patent hold-up and royalty stacking, SSOs typically have policies governing the disclosure and licensing of SEPs, which are typically set out in the SSO's rules and/or intellectual property rights policies ("IPR policies").

32. IPR policies generally require binding assurances by SSO participants and holders of SEPs that they will license any SEPs on FRAND terms. FRAND commitments require SEP holders to grant licenses to all standard implementers, and to do so at fair, reasonable, and non-discriminatory rates. IPR policies are intended to constrain the ability of SEP owners to "hold up" implementers, as well as to avoid the problems of royalty stacking. Indeed, for example, the IEEE recently clarified its policy through bylaw revisions stating that the determination of a "Reasonable Rate" for a license to claims of a SEP should include consideration of "[t]he value that the functionality of the claimed invention or inventive feature within the Essential Patent Claim contributes to the value of the relevant functionality of the smallest saleable Compliant Implementation," and "[t]he value that the Essential Patent Claim contributes to the smallest saleable Compliant Implementation that practices that claim, in light of the value contributed by all Essential Patent Claims for the same IEEE Standard practiced in that Compliant Implementation." *See* Ex. 7, IEEE-SA Standards Board Bylaws (March 2015) § 6.1.

33. To further illustrate, the IEEE-SA Standards Board Bylaws state that "[i]f the IEEE receives notice that a [Proposed] IEEE Standard may require the use of a potential Essential Patent Claim, the IEEE shall request licensing assurance, on the IEEE Standards Board approved Letter of Assurance ('LOA') form, from the patent holder or patent applicant." *Id.* at § 6.2. An LOA must be either a promise not to enforce the patents or "[a] statement that the Submitter will make available a license for Essential Patent Claims to an unrestricted number of Applicants on a worldwide basis without compensation or under Reasonable Rates, with other

reasonable terms and conditions that are demonstrably free of any unfair discrimination to make, have made, use, sell, offer to sell, or import any Compliant Implementation that practices the Essential Patent Claims for use in conforming with the IEEE Standard." *Id.* Copies of IEEE-SA Standards Board Bylaws are attached as Exs. 10, 13.

34. Significantly, FRAND commitments are binding encumbrances that obligate later owners of any SEPs to offer and grant licenses on FRAND terms. Subsequent purchasers of SEPs, such as Spherix, Rockstar, and NNPT, are thus bound by the prior owner's FRAND commitments.

35. For example, the IEEE bylaws state that "[t]he Submitter [of any assurances] and all Affiliates … shall not assign, with the intent of circumventing or negating any of the representations and commitments made in the Accepted Letter of Assurance, assign or otherwise transfer any rights in any Essential Patent Claims that they hold, control, or have the ability to license and for which licensing assurance was provided on the Accepted Letter of Assurance." Ex. 7, IEEE-SA Standards Board Bylaws (March 2015) § 6.2.

36. Cisco participates in numerous SSOs, and contributes to the development of many standards. Cisco products are also regularly certified for compliance with industry standards. For example, Cisco is a leader in the development of routers and switching equipment, and its products are certified for compliance with a large number of standards created by the IEEE and other SSOs.

37. The IEEE policies and FRAND commitments submitted pursuant to those policies constitute contracts between SEP holders (such as Nortel and later owners of the SEPs) and the members of these SSOs, or alternatively between the SEP holders and the SSOs directly, to

which Cisco and other implementers of standards are third-party beneficiaries to those commitments.

### ii. <u>Spherix Acquired Alleged SEPs That Are Subject to FRAND Obligations</u>

38. Nortel participated in many SSOs. In the context of participating in the standard-setting processes for those SSOs, Nortel made FRAND commitments relevant to technologies implicated in this case.

39. Nortel stated that before its bankruptcy, it had participated in "85 global, regional, and national standards organizations, forums and consortia, spanning IT and telecom," including many organizations in which Nortel held a leadership position. *See* Ex. 8, Excerpt from Form 10-K, Nortel Networks Corporation, filed March 2, 2009.

40. The SSOs in which Nortel participated include at least the IEEE, among numerous others.

41. In accordance with the established policies of at least the IEEE, Nortel committed to license its patents on FRAND terms by providing letters to these SSOs making formal, binding commitments.

42. On November 27, 2006, Nortel submitted an LOA to the IEEE related to the '876 and '990 Patents. *See* Ex. 9; *see also*, Ex. 10, IEEE-SA Standards Board Bylaws (May 2006). In this letter, Nortel promised to license the '876 and '990 Patents on FRAND terms to the extent the patents were essential to practice the IEEE 802.1ah standard. *See* Ex. 9. The letter states, "Nortel Networks Limited believes that its US patents 5,959,990 and 6,111,876 may be relevant and potentially essential with respect to at least portions of the 802.1ah Standard, if approved and published by IEEE. In this respect, Nortel submits that to the extent any claims of either of these patents is essential to practice the approved and adopted IEEE 802.1ah Standard, Nortel

Networks Limited declares its licensing position that it is willing, upon written request, to make available non-exclusive licenses under such patents on a non-discriminatory basis and under reasonable terms and conditions to comply with such resulting issued IEEE 802.1ah Standard." In addition, on October 30, 2000, Nortel submitted another LOA to the IEEE with respect to the '876 Patent. *See* Ex. 11. The letter, which contains the subject line "IEEE Standards 802.1Q", specifically commits to license the '876 Patent on FRAND terms to the extent it is essential to the 802.1Q standard. *Id.* ("In the event the proposed [802.1Q] standard is adopted and the standard cannot be practiced without the use of the ['876] patent, Nortel Networks Corporation agrees upon written request to grant a nonexclusive license under such patent on a nondiscriminatory basis and on reasonable terms and conditions."). The newly issued '598 Patent, among others, is a reissued patent of the '876 Patent, which itself is a continuation-in-part of the '990 Patent, and therefore the '598 Patent is subject to the commitments described above.

43. On January 12, 2000, Nortel submitted an LOA to the IEEE with respect to the '990 Patent. *See* Ex. 12. In its letter, Nortel promised to license the '990 Patent on FRAND terms if the patent was essential to the IEEE 802.3ac and 802.1Q standards. *Id.* ("Nortel Networks Corporation ('Nortel Networks') is the owner of United States Patent 5,959,990 which may be technically essential for complying with IEEE Standards 802.3ac and 802.1Q, CDMA/CD standards for Frame Extension for Virtual Bridged Local Area Network (VLAN) Tagging on 802.3 Networks (the Standards). In the event that the Standards are adopted and cannot be practiced without the use of the cited patent, Nortel Networks agrees upon written request to grant a non-exclusive license under such patent on a non-discriminatory basis and on reasonable terms and conditions."); *see also*, Ex. 13, IEEE-SA Standards Board Bylaws (October 1999). The newly issued '598 Patent, among others, is a reissued patent of the '876 Patent,

which itself is a continuation-in-part of the ’990 Patent, and therefore the ’598 Patent is subject to the commitments described above.

44. Nortel representatives, including a number of inventors of patents later owned by Spherix, NNPT, and Rockstar, participated in the standard-setting process for SSOs such as the IEEE.

45. Nortel benefited from its engagement with SSOs such as the IEEE, and the FRAND commitments it made to them. For example, the standards identified herein are at least relatively successful and widely adopted by product implementers and the public. Standardization also increased the size of the market available to Nortel as a developer of telecommunications equipment.

46. When it acquired Nortel’s large patent portfolio, Rockstar confirmed that it was subject to these FRAND obligations on any applicable SEPs. Indeed, it was required to confirm that it would adhere to Nortel’s FRAND obligations as a condition of its acquisition of Nortel’s patents under the terms of the bankruptcy court’s order transferring the patents to Rockstar.

47. Spherix is a successor-in-interest for numerous alleged SEPs originating with Nortel, and is also bound by the FRAND obligations undertaken by Nortel and prior owners of the patents. Spherix has recognized these obligations and has publicly noted that many of the patents in its portfolio are alleged SEPs. For instance, in an April 2014 presentation to investors, Spherix stated that its “patent portfolio includes patents asserted as ‘Standard Essential’ to the Institute of Electrical and Electronics Engineers (‘IEEE’) … Spherix’s Standard Essential Patents relate to aspects of IEEE standards 802 and virtual LAN (VLAN) tagging on a network.” *See* Ex. 14.

**iii. <u>Spherix Has Breached Its FRAND Obligations In Multiple Ways</u>**

48. Spherix is obligated to license or offer to license the Standard Essential Patents to Cisco on FRAND (or RAND) terms. As described herein, they have failed to do so.

49. Spherix acquired several alleged SEPs from Rockstar that are subject to FRAND obligations. These alleged SEPs include, among others, the ’876 Patent and other patents in the same family of networking technology patents as the ’598 Patent.

50. Spherix has refused to enter into good faith negotiations with Cisco and others with respect to their alleged SEPs in order to reach agreement on a FRAND royalty rate for the patents. Instead, Spherix has opted to file lawsuits against companies such as Cisco, Huawei, Juniper and Verizon in jurisdictions across the the country, costing these companies millions of dollars in legal fees, without offering or negotiating FRAND licenses to their patents in the manner their FRAND obligations require.

51. As an example, Spherix is asserting the ’990, ’999, ’876, ’775, ’065, ’081, ’095, and ’121 Patents, which are all in the same patent family as the ’598 Patent, against Cisco and its products due to the alleged use of standardized technologies. Spherix contends that these patents are essential to the IEEE 802.1ah, 802.1Q, and 802.3ac standards. For example, Spherix alleged that this family of patents is standard-essential in a press release dated September 2, 2014. There, noting the issuance of the ’065, ’081, and ’095 Patents by the Patent Office, Spherix stated that the family is composed of standard essential patents. *See* Ex. 15 (“Spherix Incorporated (SPEX) . . . today announced that the United States Patent & Trademark Office (USPTO) issued three patents to the Company in the month of August that are part of a standard essential family of patents.”). Spherix also highlighted this family of patents in a press release from March 31, 2014, stating that “several [Spherix patents] have been asserted as Standard

Essential to the Institute of Electrical and Electronics Engineers ('IEEE') and relate to the movement of data packets on a Virtual Local Area Network." *See* Ex. 16. Spherix further highlighted the family of patents in a press release on June 22, 2015, stating that the issuance on June 30, 2015 of the '598 Patent "further increases our holdings of standard essential patents" because "this is the 10th patent that has issued as part of this family of standard-essential patents." *See* Ex. 3. As described above, the '990, '999, '876, '775, '065, '081, '095, '121, '521, and '598 Patents are subject to binding FRAND obligations pursuant to letters of assurance Nortel submitted to the IEEE for the 802.1Q, 802.1ah, and 802.3ac standards.

52. Spherix has refused to enter into good faith negotiations with Cisco or make an offer on FRAND terms for the '990, '999, '876, '775, '065, '081, '095, '121, '521, and '598 Patents.

53. Cisco has requested on multiple occasions that Spherix honor its FRAND obligations, including by identifying the alleged SEPs it believes it holds in its portfolio and by making a FRAND license offer to Cisco for those patents. In spite of Cisco's repeated requests, Spherix has thus far refused to make a FRAND license offer for its portfolio of networking technology patents, to provide the requested information, or to engage in good faith negotiations with Cisco, and instead has pursued lawsuits against Cisco and others in violation of its FRAND obligations.

54. For instance, on October 7, 2014, Cisco requested in writing that Spherix identify its alleged SEP portfolio, and provide a FRAND offer covering all of its alleged SEPs. Spherix responded that it could not provide a FRAND offer to Cisco unless Cisco signed a highly restrictive non-disclosure agreement. In subsequent correspondence, Cisco again requested in

writing that Spherix provide Cisco with basic information about the alleged SEP portfolio, and further asked for Spherix to state its alleged FRAND rate.

55. Eventually, in December 2014, Spherix demanded that Cisco pay a 0.1% royalty on the ***full purchase price of*** IEEE 802.1Q compliant ***end-products*** in exchange for a license to the patent family of alleged 802.1Q SEPs in Spherix's portfolio. The license rate demanded by Spherix is unreasonable, unfair, in violation of Spherix's FRAND obligations, and in violation of the covenant of good faith and fair dealing.

56. Among other things, no attempt was made to apportion the value of the allegedly patented features of Cisco's products from the aspects of its products that are indisputably not subject to Spherix's alleged SEPs, or to account for any other patents allegedly essential to 802.1Q. In addition, no offer was extended with respect to Spherix's other alleged SEPs, which Spherix has thus far refused even to specifically identify.

57. Cisco is willing to negotiate in good faith for a license to infringed and valid patents owned by Spherix, to the extent there are any, on terms that are fair, reasonable, and nondiscriminatory, in accordance with other contract terms to be determined in connection with this proceeding.

58. Spherix has breached its express and/or implied FRAND licensing commitments by engaging in at least the following acts:

i. Spherix has refused to make a licensing offer that applies to all patents it alleges to be SEPs;

ii. Notwithstanding Cisco's multiple written and verbal requests, Spherix has refused to identify its alleged SEPs to Cisco;

iii. Spherix has refused to enter into good-faith licensing negotiations with Cisco and others. Spherix has additionally required prospective licensees such as Cisco to enter into highly-restrictive non-disclosure agreements before discussions could commence, so that Spherix can attempt to achieve licenses having non-uniform terms and obligations;

> iv. Spherix has refused to make the terms of existing license agreements and commitments publicly available or to offer such arrangements to an unrestricted number of applicants on nondiscriminatory terms and conditions; and
>
> v. Spherix acquired FRAND encumbered patents, including at least the patents discussed above, under an agreement to promptly bring a patent infringement suit; this contractual agreement to sue, rather than to offer licenses on FRAND terms as required by the commitments given by Nortel to the IEEE and other SSOs, is a violation of Spherix's FRAND obligations, and an attempt by Spherix to circumvent its obligations to license its alleged SEPs on FRAND terms.

## COUNT ONE
## BREACH OF CONTRACT WITH THE IEEE TO LICENSE THE '598 PATENT ON FRAND TERMS

59. Cisco repeats and realleges the allegations in ¶¶ 1–58 of its Complaint as though fully set forth herein.

60. On November 27, 2006, Spherix's predecessor, Nortel, provided an LOA to the IEEE agreeing to grant FRAND licenses to the '876 and '990 Patents to the extent necessary to practice the IEEE 802.1ah standard. *See* Ex. 9.

61. On October 30, 2000, Spherix's predecessor, Nortel, provided an LOA to the IEEE agreeing to grant FRAND licenses to the '876 Patent to the extent necessary to practice the IEEE 802.1Q standard. *See* Ex. 11.

62. On January 12, 2000, Spherix's predecessor, Nortel, provided an LOA to the IEEE agreeing to grant FRAND licenses to the '990 Patent to the extent necessary to practice the IEEE 802.1Q and the 802.3ac standards. *See* Ex. 12.

63. The '598 Patent is a reissued patent of the '876 Patent, which is a continuation-in-part of the '990 Patent, and therefore the '598 Patent is subject to the commitments described above.

64. Nortel was contractually obligated to offer a license to its SEPs in a manner consistent with the representations contained in the LOA it submitted to the IEEE and in accordance with IEEE's IPR policies.

65. IEEE's policies, as amended over time, constitute a contractual commitment to offer licenses to SEPs in accordance with the terms of those policies. By participating in the IEEE, Nortel and other entities whose patents Nortel acquired promised to adhere to the policies and to offer licenses to SEPs on FRAND terms.

66. IEEE's policies constitute a contract between Nortel and the IEEE's members, or alternatively between Nortel and the IEEE, to which Cisco and other implementers of the 802.1ah, 802.1Q, and 802.3ac standards are third-party beneficiaries of Nortel's contractual commitments to the IEEE.

67. FRAND and royalty-free encumbrances are irrevocable and run with the patents and, as a successor-in-interest to Nortel, Spherix is obligated to honor Nortel's FRAND licensing commitments with respect to SEPs that originated with Nortel.

68. As a result, Spherix is obligated to offer a FRAND license to Cisco for the '598 Patent to the extent necessary to practice the IEEE 802.1ah, 802.1Q, and 802.3ac standards.

69. Spherix has alleged that the '598 patent is standard essential, at least in its public statements.

70. Spherix has breached its express and/or implied commitments to license the '598 Patent on FRAND terms by engaging in at least the following acts:

i. Spherix has refused to make a licensing offer that applies to all patents it alleges to be SEPs

ii. Notwithstanding Cisco's multiple written and verbal requests, Spherix has refused to identify its alleged SEPs to Cisco

iii. Spherix has refused to enter into good-faith licensing negotiations with Cisco and others. Spherix has additionally required prospective licensees such as Cisco to enter into highly-restrictive non-disclosure agreements before discussions could commence, so that Spherix can attempt to achieve licenses having non-uniform terms and obligations

iv. Spherix has refused to make the terms of existing license agreements and commitments publicly available or to offer such arrangements to an unrestricted number of applicants on nondiscriminatory terms and conditions

v. Spherix acquired FRAND encumbered patents, including at least the patents discussed above, under an agreement with Rockstar to promptly bring a patent infringement suit; this contractual agreement to sue, rather than to offer licenses on FRAND terms as required by the commitments given by Nortel to the IEEE and other SSOs, is a violation of Spherix's FRAND obligations and an attempt by Spherix to circumvent its obligations to license its alleged SEPs on FRAND terms.

71. Through the foregoing acts, Spherix breached the express and/or implied commitments Nortel made to license the '598 Patent on FRAND terms.

72. As a result of these breaches, Cisco has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers, and loss of goodwill.

73. As a remedy for these breaches, to the extent the '598 Patent is a SEP that is valid, enforceable, and infringed, Cisco respectfully requests the equitable remedy of specific performance by Spherix of its obligations to provide a license to the '598 Patent on FRAND terms.

74. In the alternative, Cisco requests that the '598 Patent be held unenforceable.

75. As an additional remedy for Spherix's breaches, Cisco respectfully requests damages in an amount proven at trial.

**COUNT TWO**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING IMPLIED IN CONTRACT WITH THE IEEE TO LICENSE THE ’598 PATENT ON FRAND TERMS**

76. Cisco repeats and realleges the allegations in ¶¶ 1–75 of its Complaint as though fully set forth herein.

77. As discussed above, Nortel entered into a specific licensing commitment that obligated Nortel and its successors to provide licenses to certain patents, including the ’598 Patent, on FRAND terms. *See* Exs. 9, 11-12.

78. Nortel’s contractual commitments contain a covenant implied by law that Nortel, and its successors-in-interest, would deal with Cisco in good faith and with fair dealing, would take no actions to deprive Cisco of its benefits as a third-party beneficiary under Nortel’s contractual commitments, and would take such actions as necessary to protect Cisco’s enjoyment of its rights under Nortel’s contractual commitments.

79. At all relevant times, Cisco has duly performed all material conditions, covenants, and promises on its part to be performed under Nortel’s contractual commitments.

80. As successor-in-interest to Nortel, Spherix is obligated to honor Nortel’s FRAND commitments with respect to the ’598 Patent and all other alleged SEPs it has acquired that originated with Nortel, including the obligation to adhere to the covenant of good faith and fair dealing.

81. Spherix has breached the covenant of good faith and fair dealing implied in its agreement with the IEEE to license the ’598 Patent on FRAND terms by engaging in at least the following acts:

i. Spherix has refused to make a licensing offer that applies to all patents it alleges to be SEPs

ii. Notwithstanding Cisco's multiple written and verbal requests, Spherix has refused to identify its alleged SEPs to Cisco

iii. Spherix has refused to enter into good-faith licensing negotiations with Cisco and others. Spherix has additionally required prospective licensees such as Cisco to enter into highly-restrictive non-disclosure agreements before discussions could commence, so that Spherix can attempt to achieve licenses having non-uniform terms and obligations

iv. Spherix has refused to make the terms of existing license agreements and commitments publicly available or to offer such arrangements to an unrestricted number of applicants on nondiscriminatory terms and conditions

v. Spherix acquired FRAND encumbered patents, including at least the patents discussed above, under an agreement with Rockstar to promptly bring a patent infringement suit; this contractual agreement to sue, rather than to offer licenses on FRAND terms as required by the commitments given by Nortel to the IEEE and other SSOs, is a violation of Spherix's FRAND obligations and an attempt by Spherix to circumvent its obligations to license its alleged SEPs on FRAND terms

82. Through the foregoing acts, Spherix unfairly, in bad faith, arbitrarily, and unreasonably, with a motive to intentionally frustrate Cisco's enjoyment of its rights under the FRAND licensing commitments, prevented Cisco from receiving the benefits Cisco was entitled to receive under commitments to license the '598 Patent on FRAND terms.

83. As a result of these breaches, Cisco has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers, and loss of goodwill.

84. As a remedy for those breaches, to the extent that the '598 Patent is a SEP that is valid, enforceable, and infringed, Cisco respectfully requests the equitable remedy of specific performance by Spherix of its obligation to provide a license to the '598 Patent on FRAND terms.

85. In the alternative, Cisco requests that the '598 Patent be held unenforceable.

86. As an additional remedy for Spherix's breaches, Cisco respectfully requests damages in an amount to be proven at trial.

## COUNT THREE
## PROMISSORY ESTOPPEL FOR THE ’598 PATENT

87. Cisco repeats and realleges the allegations in ¶¶ 1–86 of its Complaint as though fully set forth herein.

88. Spherix’s predecessor, Nortel, made representations and engaged in other conduct, including representations that it and its successors would license the ’598 Patent to the extent it is essential to the IEEE 802.1ah, 802.1Q, and 802.3ac standards, on FRAND terms.

89. Nortel’s representations and other conduct constituted promises to the IEEE and numerous third-party beneficiaries, including Cisco and other implementers of the IEEE 802.1ah, 802.1Q, and 802.3ac standards. By making those promises, Nortel knew or reasonably should have known that they would be relied upon.

90. The IEEE and its members, and third-party beneficiaries including Cisco and other implementers of the standards, reasonably relied on the foregoing promises in adopting IEEE standards 802.1ah, 802.1Q, and 802.3ac. Cisco further reasonably relied on the foregoing promises, and the IEEE standards, in investing substantial resources into developing and marketing the products accused of alleged infringement of the ’598 Patent by Spherix.

91. Spherix, as the assignee of the ’598 Patent subject to those promises, is bound by Nortel’s representations and other conduct constituting promises to the IEEE and its members, and to third-party beneficiaries, including Cisco and other implementers of the standards.

92. Cisco has been damaged as a result of its reasonable reliance as alleged herein, in developing, marketing, selling, and using products that have been accused by Spherix of infringing the ’598 Patent. Injustice can be avoided only by enforcement of the promises so relied on.

## COUNT FOUR
## DECLARATION OF NONINFRINGEMENT OF THE ’598 PATENT

93. Cisco repeats and realleges the allegations in ¶¶ 1–92 of its Complaint as though fully set forth herein.

94. Cisco has not infringed and does not infringe any valid and enforceable claim of the ’598 Patent, either literally or under the doctrine of equivalents.

95. There exists a real and immediate controversy between Spherix and Cisco concerning alleged infringement of the ’598 Patent to warrant the issuance of a declaratory judgment. This controversy arises, for example, from at least the following: Spherix’s public statements that the patents in the family of which the ’598 Patent is a part are standard-essential patents, at least in press releases dated March 31, 2014, September 2, 2014, and June 22, 2015; LOAs submitted by Nortel to the IEEE for the ’876 Patent, of which the ’598 is a reissued patent, with respect to the IEEE 802.1Q and 802.1ah standards; LOAs submitted by Nortel to the IEEE for the ’990 Patent, of which the ’876 is a continuation-in-part, with respect to the IEEE 802.3ac and 802.1ah standards; Spherix’s allegations that Cisco requires a license to Spherix’s patents for its IEEE 802.1Q-compliant products at least as early as December 2014; Spherix’s allegations made against Verizon, alleging that the ’990 Patent (which is related to the ’598 Patent as explained above) and the ’775 and ’999 Patents (which are reissues of the ’876 Patent) are standard-essential; and Cisco’s manufacture and sale of products with IEEE 802.1Q functionality, including to Verizon and others.

96. A judicial declaration is necessary and appropriate so that Cisco may ascertain its rights regarding the ’598 Patent.

## PRAYER FOR RELIEF ON CISCO'S CLAIMS

WHEREFORE, Cisco respectfully requests that the Court enter judgment in its favor granting the following relief:

A. A declaration that Cisco has not infringed and does not infringe any valid and enforceable claim of the '598 Patent;

B. A declaration that the '598 Patent is unenforceable due to the breach of contractual obligations to the IEEE standard-setting organization to license the '598 Patent on terms that are, and in a manner that is, fair, reasonable and non-discriminatory;

D. A declaration that the '598 Patent is unenforceable due to the breach of the covenant of good faith and fair dealing with respect to contractual obligations to the IEEE to license the '598 Patent on FRAND terms;

G. A judgment requiring Spherix's specific performance under their contractual obligations with the IEEE to grant licenses to the '598 Patent to Cisco on fair, reasonable, and non-discriminatory terms and conditions;

H. An award to Cisco for the amount of damages as proven at trial;

I. An order declaring that this is an exceptional case and awarding Cisco its costs, expenses, disbursements, and reasonable attorney fees under 35 U.S.C. § 285;

N. A judgment in Cisco's favor on all of its claims; and

O. Such other and additional relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Cisco respectfully demands a jury trial on any and all issues so triable in this action.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com

*Attorneys for Plaintiff Cisco Systems, Inc.*

OF COUNSEL:

Steven Cherny
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Adam R. Alper
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400

Michael W. De Vries
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
(213) 680-8400

June 30, 2015